**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**CARLOS F. MORENO-BASTIDAS,**

     **Petitioner,**

     **v.**                         **CASE NO.  20-3137-JWL**

**WILLIAM BARR, et al.,**

     **Respondents.**

<u>**MEMORANDUM AND ORDER**</u>

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained at the Chase County Jail in Cottonwood Falls, Kansas ("CCJ"), under the authority of the Enforcement and Removal Office ("ERO"), Immigration and Customs Enforcement ("ICE"), a sub agency of the U.S. Department of Homeland Security ("DHS"), pending removal proceedings.  Petitioner raises four grounds for relief:  1) that his mandatory detention violates  procedural due process in light of his viable legal defenses to removal; 2) his prolonged detention violates procedural due process; 3) his detention is in violation of substantive due process under the Fifth Amendment; and 4) he is being subjected to unconstitutional conditions of confinement due to the COVID-19 pandemic.  Petitioner seeks immediate release or a bond hearing before an Immigration Judge within 15 days to consider release on bond or conditional parole. (Doc. 1, at 18.)

**I.  Background**

Petitioner is a native and citizen of Columbia.  Petitioner was admitted into the United States on February 27, 2009, and he later adjusted his status to that of a lawful permanent resident ("LPR") on September 2, 2010.

1

*Removal Proceedings*

On January 9, 2020, Petitioner was arrested by the Dodge City, Kansas Police Department for Assault, Failure to Appear ("FTA"), Possession of Methamphetamine, Possession of Drug Paraphernalia, and Criminal Deprivation of Property.  Declaration of Deportation Officer Jason Coman ("Coman Decl."), Attachment A, ¶ 10.  On January 10, 2020, ICE learned of Petitioner's arrest.  *Id*.  ERO submitted a Form I-247, Immigration Detainer, to the Ford County Jail where Petitioner was detained, and a Form I-200, Warrant for Arrest of Alien. *Id.* The Form I-247 notified the CCJ that ERO possessed probable cause to believe that Petitioner was present in the United States in violation of immigration laws based upon biometric confirmation of the Petitioner's identity and a records checks of federal databases that affirmatively indicated that the Petitioner was removable from the United States.  Coman Decl., ¶ 11.  The detainer asked the Ford County Jail to notify ICE of the Petitioner's release, prior to such release. *Id.*

On or about January 24, 2020, ICE took custody of Petitioner and transported him to the Wichita, Kansas ERO office for further processing. Coman Decl., ¶ 13. An initial custody determination was conducted when Petitioner was taken into ICE custody. Coman Decl., ¶17. Due to Petitioner's extensive criminal history, which is detailed in Paragraph 18 of the Coman Decl., and a Risk Classification Assessment, it was determined that Petitioner should be detained without an immigration bond.  Coman Decl., ¶ 17.

Petitioner was served several documents explaining that he was being placed into removal proceedings before an Immigration Judge and explaining his rights.  Coman Decl., ¶ 13. The documents included: (1) a Form I-200, Warrant of Arrest; (2) a Form I-286, Notice of Custody Determination, informing him of ICE's detention decision; and (3) a Form I-862, Notice

to Appear ("NTA"), the charging document that commenced removal proceedings before the Immigration Court, which charged Petitioner with removability under 8 U.S.C § 1227(a)(2)(B)(i). *Id.* On or about January 29, 2020, the Office of Principal Legal Advisor ("OPLA") filed Petitioner's NTA with the Kansas City, Missouri Immigration Court. Coman Decl., ¶ 20.  OPLA also submitted conviction records demonstrating that on January 10, 2013, and April 9, 2014, Petitioner was convicted of Marijuana Possession in violation of K.S.A § 21-5706(b)(3). *Id.*

On February 3, 2020, Petitioner appeared before an Immigration Judge via Video Teleconference. Coman Decl., ¶ 21. Petitioner admitted the factual allegations contained in the NTA and the Immigration Judge sustained the sole ground of removability. *Id.* Petitioner requested a continuance to complete an application for relief from removal. *Id.* Also on February 3, 2020, the Immigration Judge denied Petitioner's request for release on bond. Coman Decl., ¶ 22. Petitioner reserved appeal of the Immigration Judge's no bond order, but did not appeal the bond decision.  Coman Decl., ¶ 22.

On March 9, 2020, Petitioner appeared before the Immigration Judge via Video Teleconference for a final hearing on his application for relief. Coman Decl., ¶ 24. At the conclusion of the hearing, the Immigration Judge informed Petitioner that he was going to deny his application for relief, but he would be issuing a written decision explaining the reasons for the denial. *Id.* The Immigration Judge also explained to Petitioner his right to appeal the decision. *Id.* On March 10, 2020, the Immigration Judge issued the written decision denying Petitioner's application for relief and ordering him removed to Colombia.  Coman Decl., ¶ 25.

On or about April 2, 2020, Petitioner filed an appeal of the Immigration Judge's decision to the Board of Immigration Appeals ("BIA"). Coman Decl., ¶ 26. The BIA rejected the appeal

because Petitioner failed to include a $110 fee or a Fee Waiver Request (Form EOIR-26-A). *Id.* Petitioner resubmitted the appeal along with a Form EOIR-26-A on or about April 2, 2020. *Id.* The Board accepted Petitioner's appeal on April 22, 2020. *Id.* Petitioner's appeal remains pending with the BIA. *Id.*

***Petitioner's Medical Status***

On or about April 10, 2020, ICE ERO issued *ERO COVID-19 Pandemic Response Requirements* ("PRR"), which sets forth expectations and assists ICE detention facility operators to sustain detention operations, while also mitigating risk from COVID-19. Coman Decl., ¶ 27; Ex. 2 to Sigler Decl. As part of this dynamic guidance, ERO's Assistant Director of Field Operations, Peter Berg, issued expanded guidance directing the ERO field offices to review the custody of subgroups of detainees to determine whether the alien's COVID-19 risk outweighed continued detention. *Id.* The delineated subgroups were: (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders. *Id.*

ERO officers questioned Petitioner about any potential underlying health issues after he came into the Department's custody in January of 2020. Coman Decl., ¶ 28. Petitioner informed ERO officers that he was in good health and did not take any medications. *Id*. Petitioner made no claim to the medical conditions referenced in Paragraph 51 of his Petition. *Id*. Furthermore, when booked into the Department's custody, his height was listed as 5'10" and his weight was listed as 160 lbs. *Id*. Using a Body Mass Index ("BMI") calculator from the Centers for Disease

Control and Prevention, Petitioner would not be considered obese; his BMI would be 23.0, which would fall within a normal weight range. *Id.*

Based on the information known to ICE, Petitioner does not have a medical condition identified in one of the sub-groups delineated in the PRR. Coman Dec., ¶ 30.  Nor do ICE records reflect Petitioner as having any medical or psychiatric diagnoses implicated in the class or subclass defined in the class action identified as *Fraihat et al. v. U.S. Immigration & Customs Enforcement, et al.*, ___ F.Supp.3d ___, 2020 WL 1932570 (Apr. 20, 2020).  Coman Decl., ¶¶ 31–32.

Petitioner also received a physical within the first 14 days of his arrival at the CCJ. Declaration of Larry Sigler, Administrator, Chase County Jail ("Sigler Decl."), Attachment B, ¶ 43. CCJ has received no information or indication to suggest Petitioner suffers from obesity, colorectal bleeding, pre-diabetes, or hypertension. *Id.* CCJ's medical records also reflect Petitioner's height and weight indicate his BMI is within the normal range. *Id.* Petitioner's blood sugar levels and cholesterol levels were also within the normal range during his physical and he does not have a diagnosis of diabetes or high cholesterol. *Id.*

CCJ is in compliance with the guidance issued by ICE ERO to detention facilities that house ICE detainees, including mandatory reporting and identification requirements relating to detainees that meet the CDC's identified populations potentially being at higher risk for serious illness from COVID-19. Sigler Dec., ¶¶ 40–41.  Petitioner does not fall within the CDC's identified populations potentially being at higher-risk for serious illness from COVID-19 because he is under the age of 65 and has not been diagnosed with any underlying medical conditions noted by the CDC as being higher risk for COVID-19.  Sigler Decl., ¶ 42.

*Conditions at the CCJ*

The CCJ has an Intergovernmental Services Agreement ("IGSA") with ICE ERO, and has housed immigration detainees since 2008.  Sigler Decl., ¶ 9.  The CCJ is a correctional facility located in Chase County, Kansas, capable of housing 150 inmates.  Sigler Decl., ¶ 8.  The CCJ currently houses 75 inmates, which represents approximately 50% of the CCJ's capacity. Sigler Decl., ¶ 8.  The number of inmates housed at the CCJ has been reduced since April 15, 2020, in an effort to limit inmate population due to the COVID-19 pandemic, and it is not anticipated that the inmate population will increase significantly in the foreseeable future.  Sigler Decl., ¶ 8.  The CCJ has reduced the number of other counties from which it accepts inmates and now only accepts inmates from Morris County, Kansas, in addition to those inmates from Chase County.  Sigler Decl., ¶ 11.  Of the 75 inmates currently housed at the CCJ, 69 are immigration detainees and 6 are county inmates.  Sigler Decl., ¶ 10.

As of June 1, 2020, the State of Kansas has reported 10,011 cases of COVID-19 in the state, resulting in 217 deaths.[1]  Sigler Decl., ¶ 4.  As of June 1, 2020, the State of Kansas reported only four positive cases of COVID-19 within the county, which equates to a case rate of 1.51 cases per 1,000 people; however, Chase County Health Department later determined that the fourth reported case in Chase County was actually from an adjacent county, bringing the total number of cases in Chase County back down to three.  Sigler Decl., ¶ 6.  All three positive cases in Chase County have recovered.   Sigler Decl., ¶ 7.  The CCJ has implemented numerous precautions to protect inmates from the COVID-19 pandemic.

---

[1] The website for the Kansas Department of Health and Environment shows the following state totals as of June 29, 2020:  14,443 cases; 1,152 hospitalizations; 270 statewide deaths; and 162,282 negative tests.  The website reflects four total cases in Chase County as of that date.  See https://www.coronavirus.kdheks.gov/160/COVID-19-in-Kansas (last visited July 1, 2020).

Beginning March 20, 2020, the CCJ adapted its procedures to limit the risk of COVID-19 exposure to inmates.  Sigler Decl., ¶ 12.  The CCJ has been closed to the public and all inmate visitation privileges have been suspended since March 19, 2020.  Sigler Decl., ¶ 13.  All inmate court appearances occur remotely via video from within a courtroom located in the CCJ, in an effort to limit contact between inmates and people outside of the facility, and the courtroom is cleaned and sanitized between dockets.  Sigler Decl., ¶ 14.  The only people who enter the CCJ, other than CCJ staff members, are ICE agents bringing in detainees or emergency maintenance workers, if necessary.  Sigler Decl., ¶ 15.  The ICE agents and emergency workers are temperature checked upon entry to the building and wear masks at all times.  Sigler Decl., ¶ 15.

The CCJ employs approximately 30 staff members, including correctional officers, medical staff, and kitchen staff.  Each staff member receives a medical screening upon arrival at the CCJ.  Sigler Decl., ¶ 16.  Medical personnel conduct the screening, which includes a temperature check and questioning, consistent with CDC guidelines, to determine whether the employee displays any signs or symptoms of COVID-19.  Sigler Decl., ¶ 16.  If an employee has a temperature of 100º or higher or shows any other signs or symptoms of COVID-19, the employee will be sent home to quarantine and all medical staff and inmates who have been in close contact with the potentially positive employee will continue to be screened.  Sigler Decl., ¶ 16.  Staff members wear masks at all times when in contact with inmates regardless of the length of time of the contact, and also wear masks when in confined areas with other staff members.  Sigler Decl., ¶ 17.  Staff members have been educated regarding the signs and symptoms of COVID-19 and the importance of disinfecting communal spaces.  Sigler Decl., ¶ 17.  No CCJ staff member or inmate has tested positive for COVID-19.  Sigler Decl., ¶ 18.

The CCJ is divided into one open dorm that houses up to 20 inmates, eight pods that each

house up to 16 inmates, one pod that houses up to four inmates, and five segregated cells that each house up to two inmates.  Sigler Decl., ¶ 19.[2]  Petitioner is currently housed in K Pod, and all inmates housed in that Pod have been housed in the CCJ for over one month.  Sigler Decl., ¶ 39.

Restrooms and showers are located within the separated spaces and are not shared between inmates housed in different pods.  Sigler Decl., ¶ 19.  Meals are served to inmates in their dorm or pod and no communal cafeteria is used.  Sigler Decl., ¶ 19.  The only facilities used by inmates outside of their pods are the recreation yard and the courtroom.  Sigler Decl., ¶ 20. Inmates of one pod do not use the recreation yard or the courtroom at the same time as an inmate from another pod, and the areas are disinfected before and after access by members of different pods.  Sigler Decl., ¶ 20.

Beginning March 20, 2020, in response to the COVID-19 pandemic, the CCJ started a 14-day cohorting procedure for new inmates.[3]  Sigler Decl., ¶ 21.  When inmates arrive from another facility, instead of being housed with existing inmates, as was the procedure prior to the COVID-19 pandemic, the group of new inmates is cohorted for at least 14 days.  Sigler Decl., ¶ 22.  If 14 days pass without any inmate in the cohort showing symptoms of COVID-19, the inmates are removed from the cohort and housed with other inmates outside of the cohort.  Sigler Decl., ¶ 22.  If one person in a cohort shows symptoms of COVID-19, the person will be removed from the cohort and placed in a segregated cell and the remaining cohort will remain isolated until 14 days pass without any inmate showing symptoms of COVID-19.  Sigler Decl., ¶ 22.  Two of the nine pods at the CCJ are currently reserved for cohorting.  Sigler Decl., ¶ 22. In addition to screenings for COVID-19, each new inmate receives a full physical within the 14-

---

[2] As noted above, the CCJ is currently operating at approximately 50% capacity with only 75 inmates.

[3] Cohorting refers to the practice of isolating inmates as a group to minimize interaction of individuals who may be infected or may have been exposed to COVID-19 from non-infected individuals.

day cohorting period.  Sigler Decl., ¶ 23.  The last inmate to arrive at the CCJ prior to initiation

of the cohorting procedure arrived on March 10, 2020, and was placed in a pod on March 14,

2020.  Sigler Decl., ¶ 24.

In the event an inmate within Petitioner's pod shows signs or symptoms of COVID-19,

the inmate will be removed from the pod and placed in a segregated cell.  Sigler Decl., ¶ 25.  The

inmate will then be tested for COVID-19 and, if the results are positive, will remain separated

from the other inmates until the inmate no longer poses a risk of infecting others.  Sigler Decl.,

¶ 25.  The remaining members of the pod will be continually screened for signs and symptoms of

COVID-19.  Sigler Decl., ¶ 25.  In the event the number of confirmed cases exceeds the number

of segregated spaces available in the CCJ, ICE will be notified promptly so that inmates may be

transferred to other facilities.  Sigler Decl., ¶ 26.

The Chase County Health Department has indicated COVID-19 tests are available and

the CCJ has had no problem obtaining testing for the one employee and three inmates that have

been tested.  Sigler Decl., ¶ 27.

Medical staff at the CCJ consists of a registered nurse on duty from 7:00 a.m. to

3:00 p.m., Monday through Friday, and on call 24/7, a certified medical assistant on duty on the

weekends, and a doctor on call daily until 10:30 p.m.  Sigler Decl., ¶ 28.  Medical staff visit each

pod at least once a day to provide medication and care and to respond to any questions or health

concerns of inmates.  Sigler Decl., ¶ 29.  Opportunity for open dialog with medical staff is

available at these times, and an inmate need not make a special request to discuss questions or

concerns.  Sigler Decl., ¶ 29.  Medical care is also available to inmates upon request, and inmates

are encouraged to seek medical care if they fall ill.  Sigler Decl., ¶ 29.

Notices furnished by ICE and printed from the CDC website in English and Spanish were

posted in each pod on March 20, 2020.   Sigler Decl., ¶ 30.   The notices provide recommendations to help prevent the spread of respiratory diseases like COVID-19 and guidance on how inmates can protect themselves from COVID-19.   Sigler Decl., ¶ 30.   These notices include information about the importance of hand-washing and hand hygiene, avoiding close contact with other people, covering coughs and sneezes with a tissue instead of hands, avoiding touching the eyes, nose, and mouth, and disinfecting commonly used surfaces.   Sigler Decl., ¶ 30.   The notices also provide education regarding the symptoms of COVID-19 and encourage anyone showing the signs to seek medical attention.   Sigler Decl., ¶ 30.

All inmates at the CCJ are provided with soap and shampoo twice weekly and encouraged to clean themselves daily.   Sigler Decl., ¶ 31.   Petitioner has unlimited access to the shower facilities in his pod, except during nighttime lockdown.   Sigler Decl., ¶ 31.   In the event an inmate runs out of personal cleaning products before the next scheduled distribution, the inmate need only request additional cleaning products by filling out an Inmate Communication Request form and handing it to the correction officer on duty.   Sigler Decl., ¶ 32.

In addition to personal cleaning products, the CCJ also provides a cleaning cart in each pod, which contains disinfectant, spray bottles, mops, rags, and paper towels for inmates to clean their cells and other surfaces in the pod.   Sigler Decl., ¶ 35.   If the cleaning cart runs out of supplies, an inmate need only push a button to notify the correction officer on duty and the supply will be replenished.   Sigler Decl., ¶ 35.   The CCJ was well-stocked in cleaning supplies prior to the COVID-19 pandemic and has not faced a shortage of cleaning supplies as a result of COVID-19.   Sigler Decl., ¶ 36.   Personal clothing is changed and laundered daily, uniforms are changed and laundered three times per week, and bedding is laundered once per week.   Sigler Decl., ¶ 37.

Inmate Communication & Request Forms are available for inmates to communicate with corrections officers and medical staff.  Sigler Decl., ¶ 38.  The form directs the inmate to circle one of the following types of communication: Appeal, Request, Medical, Attorney Call, Grievance, Law Library, or Property Release, and provides places for the inmate to further describe the purpose of the request, as well as a place for the responding officer to write a response.  Sigler Decl., ¶ 38.  These forms can be used by inmates to request additional cleaning supplies, request medical attention or care, or convey grievances regarding the condition of the pods, inadequate supplies, or inadequate medical attention.  Sigler Decl., ¶ 38.

The CCJ is familiar with all applicable COVID-19 related guidance, including the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* issued by the CDC, and is committed to taking all reasonable steps to ensure the health and safety of all inmates at the CCJ.  Sigler Decl., ¶¶ 44-45; Ex. 3 to Sigler Decl.

**II. Discussion**

To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  The federal district courts have habeas corpus jurisdiction to consider the statutory and constitutional grounds for immigration detention that are unrelated to a final order of removal.  *Demore v. Kim*, 538 U.S. 510, 517–18 (2003).

Petitioner raises four grounds for relief.  First, Petitioner argues that Respondents have abrogated their duty to provide for Petitioner's health and safety due to the COVID-19 pandemic, warranting his immediate release.  Petitioner also argues that his prolonged detention without a bond hearing violates procedural due process.  He also argues that his detention

violates procedural due process because he has viable defenses to removal. Lastly, Petitioner asserts a substantive due process violation, alleging that there is no reasonable relation between his detention and a government interest.

## A.  Risk to Petitioner's Health and Safety

Petitioner argues that his continued detention threatens his safety and well-being amid the global pandemic of COVID-19. Petitioner is 39 years old and has a "lengthy history of smoking." (Doc. 1, at 10). Petitioner alleges that he has underlying health conditions, including obesity and colorectal bleeding. *Id*. He also alleges that he suffers from pre-diabetes and high cholesterol. *Id*.

The Court recognizes that some courts have found that an argument regarding the conditions posed by COVID-19 must be brought in a civil rights action, while others have found that it is properly raised in a habeas petition. *See, e.g., Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *2 (D. Colo. May 12, 2020) (finding that the court lacked jurisdiction over request for immediate release based on COVID-19 because "a conditions-of-confinement claim cannot be asserted in a petition for habeas corpus under binding Tenth Circuit precedent") (citing *Palma-Salazar v. Davis*, 677 F.3d 1031, 1035 (10th Cir. 2012)); *Archilla v. Witte*, No. 4:20-cv-00596-RDP-JHE, 2020 WL 2513648, at *19 (N.D. Ala. May 15, 2020) (noting that petitioners, who are seeking release from ICE custody due to the COVID-19 outbreak, are trying to shoehorn a conditions-of-confinement claim under section 2241); *cf. Ruderman v. Kolitwenzew*, Case No. 20-cv-2082, 2020 WL 2449758, at *7 (C.D. Ill. May 12, 2020) (finding that "[c]ourts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition) (collecting cases). However, the Court finds that even considering

Petitioner's arguments for immediate release due to the conditions posed by COVID-19, Petitioner has not shown that his immediate release is warranted in this case.

First, the Court notes that many courts have found that release is warranted due to a petitioner's particular vulnerabilities or health conditions.  *See, e.g., id*. at *13 ("while for most individuals, JCDC's measures would likely be more than sufficient to survive a due process challenge, Petitioner's unique medical conditions place him at an increased risk of serious illness or death"); *Fraihat v. U.S. Immigration and Customs Enforcement*, ___ F. Supp. 3d ___, 2020 WL 1932570, at *29, n.20  (C.D. Cal. April 20, 2020) (granting preliminary injunction and emergency motion to certify subclasses and defining risk factors as "being over the age of 55; being pregnant; or having chronic health conditions, including:  cardiovascular disease . . .; high blood pressure; chronic respiratory disease . . .; diabetes; cancer; liver disease; kidney disease; autommimune diseases . . .; severe psychiatric illness; history of transplantation; and HIV/AIDS"); *see also ERO COVID-19 Pandemic Response Requirements* (issuing guidance and directing the ERO field offices to review custody of the following subgroups:  (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders).

However, Petitioner's alleged health concerns do not place him in any of the categories described in the ERO's PRR and Petitioner does not have any medical or psychiatric diagnoses that implicate the class or subclass defined in *Fraihat*.  In addition, the Court is not persuaded that the conditions at the CCJ warrant Petitioner's immediate release.  While courts have ordered

immediate release or have ordered that extra precautions be taken, in this case it appears that the CCJ is taking appropriate precautions. *See, e.g., Thakker v. Doll*, No. 1:20-cv-480, ___ F. Supp. 3d ___, 2020 WL 2025384 (M.D. Pa. April 27, 2020) (where immigration detainees each suffered from chronic medical conditions and faced an increased risk of death or serious injury if exposed to COVID-19, continuation of release was granted for three detainees at facility that already had 40 confirmed cases of the virus, and was denied for seven detainees who had committed violent offenses or were being held in facilities without any known cases of COVID-19, or facilities with enhanced prevention measures).

Even if Petitioner's claim could properly be considered in a habeas petition, Petitioner has not shown that the CCJ failed to take adequate steps to ensure Petitioner's health and safety in light of the COVID-19 pandemic.  Furthermore, considering Petitioner's health and his failure to show that he faces a significant risk of contracting COVID-19, his request for immediate release is unwarranted.

**B.  Due Process**

Petitioner argues that his prolonged detention without a bond hearing violates procedural due process.  He has been detained since January 2020, and during his detention, no neutral decisionmaker has conducted a hearing to determine if his lengthy detention is warranted due to him either being a danger to the community or a flight risk.  Petitioner also argues that his viable defenses to removal render his detention unconstitutional.  Petitioner alleges that "[g]iven the legal merits of Mr. Moreno's position eventual removal is not likely."  (Doc. 1, at 8.)  While Petitioner acknowledges that DHS has authority to detain individuals in removal proceedings, he argues that a substantive due process violation arises where there is no reasonable relation between an individual's detention and a government interest.  *Id.* at 9–10.  Petitioner argues that

"[t]he fact that [he] will not likely be removed defeats the government's justification for his continued detention."  *Id*. at 10.  Petitioner argues that absent a strong special justification, prolonged detention under § 1226(c) runs afoul of due process requirements.  *Id*.

Petitioner is currently detained under 8 U.S.C. § 1226(c) for further consideration of his application for relief in formal removal proceedings.  Section 1226(c) sprang from a "concer[n] that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers."  *Nielsen v. Preap*, 139 S. Ct. 954, 960 (2019) (quoting *Demore*, 538 U.S. at 513).  "To address this problem, Congress mandated that aliens who were thought to pose a heightened risk be arrested and detained without a chance to apply for release on bond or parole."  *Id*.  The Supreme Court has held that "both of subsection (c)'s mandates—for arrest and for release—apply to any alien linked with a predicate offense identified in subparagraphs (A)–(D), regardless of exactly when or even whether the alien was released from criminal custody."  *Id*. at 971 (noting that respondents did not raise a constitutional argument).

In *Demore*, the Supreme Court noted that it was "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  But it also held that mandatory detention for the "limited period" necessary for removal proceedings is constitutional.  *Demore*, 538 U.S. at 529–31.  In doing so, the Supreme Court reasoned that detention under § 1226(c) during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  *Id*. at 528.  It further reasoned that, unlike the "indefinite" and "potentially permanent" post-removal-period detention contemplated

in *Zadvydas*, detention during an alien's removal proceeding has "a definite termination point," namely, the conclusion of the removal proceeding, and generally lasts for a "limited period" of time. *Demore*, 538 U.S. at 529–30 (quoting *Zadvydas*, 533 U.S. at 690–91).

In *Jennings v. Rodriguez*, the Supreme Court noted that "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). . . [and] also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018).   "Section 1226(c) in turn states that the Attorney General 'shall take into custody any alien' who falls into one of the enumerated categories involving criminal offenses and terrorist activities." *Id*. at 846 (citing 8 U.S.C. § 1226(c)(1)).  The Supreme Court noted that detention under § 1226(c) has "'a definite termination point'; the conclusion of removal proceedings". . . [and] that 'definite termination point'—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c)." *Id*. (citing *Demore v. Kim*, 538 U.S. 510, 529 (2003)).  The Supreme Court declined to consider respondents' constitutional arguments. *Id*. at 851.

After the decisions in *Demore* and *Jennings*, courts have addressed the constitutional arguments in determining when an alien's prolonged mandatory detention under § 1226(c) becomes unconstitutionally prolonged. *See Smith v. Barr*, ___ F. Supp. 3d ___, 2020 WL 1250825, at *9 (N.D. Okla. March 16, 2020) (stating that several courts have concluded that because *Demore* relied on incorrect data regarding the average length of time for completion of removal proceedings, it does not address the question of when detention becomes unconstitutionally prolonged) (citing *Singh v. Choate*, No. 19-CV-00909-KLM, 2019 WL 3943960, at *4 (D. Colo. Aug. 21, 2019) (unpublished); see also *Chairez-Castrejon v. Bible*, 188

F. Supp. 3d 1221, 1225–26 (D. Utah 2016) (noting that *Demore*'s holding was limited and discussing split among circuit courts as to the best method to analyze reasonableness of prolonged mandatory detention during removal proceedings).

Petitioner argues that his detention is unreasonable in light of his viable defense to removal. Petitioner believes that he is statutorily eligible for cancellation of removal under 8 U.S.C. § 1229b(a). (Doc. 4, at 3.) Petitioner's arguments have already been rejected by the Immigration Judge. While not dispositive, some courts have considered the likelihood that the removal proceedings will result in a final order of removal as a factor in determining the reasonableness of prolonged detention.

The court in *Smith* found that several courts post-*Jennings* "have continued to analyze the reasonableness of prolonged mandatory detention under § 1226(c), on a case-by-case basis, by considering the following factors:"

> (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings caused by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal.

*Smith*, 2020 WL 1250825, at *9 (citing *Singh*, 2019 WL 3943960, at *5 (quoting *Jamal A. v. Whitaker*, 358 F. Supp. 3d 853, 858–59 (D. Minn. 2019)); *see also Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 279 (3d Cir. 2018) (noting that *Jennings* did not impact the Third Circuit's "constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long" or its holding "that due process entitles § 1226(c) detainees to a bond hearing at some point, with the exact time varying with the facts of the case"); *Thompson v. Horton*, No. 4:19-CV-00120-AKK-HNJ, 2019 WL 4793170, at *5 n.7 (N.D. Ala. Aug. 26, 2019)

(unpublished) (collecting cases decided after *Jennings* that consider as-applied due process challenges to § 1226(c)).

The petitioner in *Aguayo v. Martinez*, who was mandatorily detained under § 1226(c), argued that his nine-month detention without bond violated his right to due process under the Fifth Amendment to the Constitution. *Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *3 (D. Colo. May 12, 2020). The court held that petitioner's argument runs counter to *Demore*. *Id.* The court held that "[u]nder *Demore*, detention without bond under Section 1226(c) is a constitutionally permissible aspect of the removal proceedings." *Id.* (citing *Demore*, 538 U.S. at 531). The court also found that Mr. Aguayo's prolonged detention was largely of his own making where he had requested—and been granted—eight continuances of his removal proceedings to permit his parallel application for an adjustment of status to be resolved before any final order of removal was entered. *Id.* The court refused to apply a multi-factor balancing test, finding that:

> While the specific holding of *Demore* was that the Ninth Circuit erred in holding that six months of pre-removal detention under Section 1226(c) was presumptively illegal, its holding was broader than the underlying facts: "detention during removal proceedings"—even longer-than-average detention—"is a constitutionally permissible part of that process" so long as there is no evidence that the government isn't improperly or arbitrarily delaying removal. 538 U.S. at 531. Indeed, the Supreme Court has since explained that detention under Section 1226(c) is constitutional because it is necessarily limited—it ends at the conclusion of removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018) (noting that in *Demore*, the Court held that "[Section] 1226(c) has 'a definite termination point': the conclusion of removal proceedings."). Given this, the Supreme Court has warned lower courts not to graft "some arbitrary time limit" onto pre-removal detention under Section 1226(c). *Id.* Perhaps it's possible that detention under Section 1226(c) might become unreasonable if the government, say, arbitrarily extends or suspends detention or removal proceedings. *See Demore*, 538 U.S. at 531–32 (Kennedy, J., concurring) (noting that a bond hearing

> might be required if "continued detention became unreasonable or unjustified"); *see also Singh*, 2019 WL 3943960, at *4 (relying on Justice Kennedy's concurrence in *Demore* to craft a multi-factor balancing test).[] But Mr. Aguayo's detention continues to be tethered to the government's legitimate interest in detaining him during his removal proceedings. *See Id.* at 512. He offers arguments why he shouldn't be removed and why he is being held improperly under Section 1226(c) without bond. But those arguments don't undermine the rule announced in *Demore*— detention of criminal alien is permissible as long as the government is pursuing removal. And as explained, it appears that much of the delay is due to Mr. Aguayo's own actions, not the government's.[] Nine months is a long time for a removal process, to be sure. But in these circumstances, it is not unconstitutional.

*Aguayo*, 2020 WL 2395638, at *4.

Petitioner was taken into ICE custody on January 24, 2020. Petitioner has been in detention for a little over five months. An order of removal was entered by the Immigration Judge on March 10, 2020, after Petitioner had been in ICE custody for only 46 days. He currently remains in custody as a result of his appeal of the removal order to the BIA. Petitioner points to no delay caused by the government. Petitioner has not shown that his detention under § 1226(c) has become unreasonable or unjustified. The government is still pursuing removal and Petitioner's detention "continues to be tethered to the government's legitimate interest in detaining him during his removal proceedings." Petitioner has failed to show that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

**IT IS THEREFORE ORDERED BY THE COURT** that the petition is **denied.**

**IT IS SO ORDERED**.

Dated July 6, 2020, in Kansas City, Kansas.

S/  John W. Lungstrum
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**